IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION


STEPHANIE L. CLIFTON                                                           PLAINTIFF


       v.                          CIVIL NO. 6:19-CV-6024


ANDREW M. SAUL,[1] Commissioner,
Social Security Administration                                                 DEFENDANT


**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Plaintiff, Stephanie L. Clifton, brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration (Commissioner) denying her claim for supplemental security income (SSI) under the provisions of Title XVI of the Social Security Act (Act). In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. See 42 U.S.C. § 405(g).

I.     **Procedural Background:**

Plaintiff protectively filed an application for SSI on April 28, 2016, alleging an inability to work since January 1, 2010, due to posttraumatic stress disorder. (Tr. 64, 81). An administrative hearing was held on November 8, 2017. (Tr. 47-62). Plaintiff was present and

---

[1] Andrew M. Saul, has been appointed to serve as Commissioner of Social Security, and is substituted as Defendant, pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

1

testified. (Tr. 47-58). William W. Elmor, Vocational Expert (VE), was also present and testified. (Tr. 58-61).

In a written opinion dated May 31, 2018, the ALJ found that Plaintiff had the following severe impairments: cataracts, obesity, schizoaffective disorder, anxiety, obsessive-compulsive disorder, personality and impulse control disorder, post-traumatic stress disorder, and substance abuse disorder. (Tr. 30). However, after reviewing the evidence in its entirety, the ALJ determined that the Plaintiff's impairments did not meet or equal the level of severity of any listed impairments described in Appendix 1 of the Regulations (20 CFR, Subpart P, Appendix 1). (Tr. 31). The ALJ found Plaintiff retained the residual functional capacity (RFC) to perform light work as defined in 20 CFR § 416. 967(b), and that she was able to see to avoid hazards in the work area. (Tr. 33). The ALJ limited Plaintiff to unskilled work and found that she could perform simple, routine, and repetitive tasks. (Tr. 33). She also found that Plaintiff could make simple work-related decisions, that interpersonal contact must be incidental to work performed, and that supervision must be simple, direct and concrete. (Tr. 33). With the help of a VE, the ALJ determined that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform, such as a cleaner-housekeeper and a price marker. (Tr. 40). Ultimately, the ALJ concluded that Plaintiff had not been under a disability within the meaning of the Social Security Act since April 28, 2016, the date the application was filed. (Tr. 40).

Subsequently, Plaintiff requested a review of the hearing decision by the Appeals Council, which denied that request on September 18, 2018. (Tr. 7-11). Plaintiff filed a Petition for Judicial Review of the matter on January 22, 2019. (Doc. 1). Both parties have submitted briefs, and this case is before the undersigned for report and recommendation. (Docs. 11, 12).

The Court has reviewed the transcript in its entirety. The complete set of facts and arguments are presented in the parties' briefs and are repeated here only to the extent necessary.

**II.     Evidence Submitted:**

At the hearing before the ALJ on November 8, 2017, Plaintiff testified that she was born in 1972 and graduated from high school. (Tr. 49). Testimony showed that Plaintiff did not have any past relevant work. (Tr. 49-50, 59).

Medical evidence during the relevant time period reflects that on June 13, 2016, Plaintiff underwent a General Physical Examination by Dr. Daniel Irons. (Tr. 248). Plaintiff's history of physical abuse, including several abusive partners, was noted. (Tr. 248). Her neurological examination and her psychiatric examination were normal. (Tr. 250). Dr. Irons listed her diagnosis as posttraumatic stress disorder, obesity and status post right arm laceration with ORIF repair. (Tr. 251). At the conclusion of his examination, he opined that she did not have any physical limitations. (Tr. 251).

On June 20, 2016, Plaintiff underwent a mental diagnostic evaluation by Dr. Linda Runion Josef, Ph.D. (Tr. 253). Plaintiff reported physical issues with chronic pain in her leg, legal blindness in her left eye, torn ligaments in her left leg, and swelling and pain when she would stand and walk. (Tr. 253). Plaintiff stated that she did not wear corrective lenses because she could not afford them. (Tr. 253). Plaintiff also reported behaviors including a pervasive pattern of unstable and intense relationships, some involving physical abuse and subsequent development of PTSD symptoms. (Tr. 253). She described identity disturbance, self-damaging impulsivity, with a past history of intentional self-cutting, and suicidal behavior including pill overdoses. (Tr. 253). Plaintiff reported childhood abuse, as well as adult abuse,

including a boyfriend that kidnapped her and tortured her, and another boyfriend that raped her. She reported becoming pregnant from the rape and suffering from anxiety so severe that her parental rights were terminated. (Tr. 253). She reported anxiety, fear, irritability, occasional angry outbursts, reckless behavior, difficulty concentrating, and disturbed sleep. (Tr. 254). Plaintiff reported that her mother was a heroin addict, that she was in and out of foster care, and that she was abused by a foster family. (Tr. 254). Plaintiff's history of psychiatric treatment included inpatient treatment at the age of 16, but no formal mental health treatment as an adult. She saw an outpatient therapist twice a month in 2010 or 2011, as part of her custody case with DHS, and was prescribed medications but could not remember the names. (Tr. 254). Dr. Josef noted that Plaintiff was not currently on any medication. (Tr. 254). Plaintiff lived with her husband and his parents, who were trying to help them get back on their feet and stay "clean." She reported legal issues and a history of alcohol and drug use. (Tr. 255). Plaintiff was late for the interview; she had an anxious, irritable, and fidgety manner; she became distraught; and she exhibited restless and agitated behavior. (Tr. 256). Plaintiff was alert and oriented. (Tr. 257). Dr. Josef noted that Plaintiff minimized her substance abuse; however, the pattern she described was strongly suggestive of work and social problems related to substance abuse. Dr. Josef noted that it was possible that after living with her in-laws that her capabilities would substantially improve as she progressed into full remission. Plaintiff was diagnosed with posttraumatic stress disorder, borderline traits, and polysubstance use disorder. (Tr. 258). Dr. Josef noted that Plaintiff participated in normal activities of daily living; that she appeared to be capable of adequate and socially appropriate communication and interaction despite some mild irritability and agitation; that Plaintiff did not have any difficulty that day of communicating in an understandable and effective manner; that Plaintiff

exhibited the capacity to cope with the typical mental/cognitive demands of basic work-like tasks; that she exhibited the ability to attend and sustain concentration on basic tasks; that she displayed low persistence; and that she had the capacity to perform tasks within a basically acceptable timeframe. (Tr. 259).

On June 27, 2016, Dr. Kevin Santulli, Ph.D., a non-examining medical consultant, completed a Psychiatric Review Technique and a Mental RFC Assessment where he found that Plaintiff was capable of work where interpersonal contact was incidental to work performed, e.g. assembly work, complexity of tasks was learned and performed by rote, few variables, little judgment, and supervision required was simple, direct and concrete. (Tr. 70, 75).

On July 21, 2016, Plaintiff was seen at McFarland Eye Centers for decreased vision in both eyes. (Tr. 261). Clinic notes indicated that Plaintiff's mood and affect were normal and that she was oriented to person, place and time. (Tr. 262). Plaintiff's Visual Field Interpretation testing showed the following: no apparent glaucomatous or neurological defects seen on "visual field OU," and test findings were not consistent with eye health OU. (Tr. 265). After an examination, Dr. Tom Chew, OD, diagnosed Plaintiff with a combined form of age-related cataracts, bilaterally. He did not recommend any treatment, and Plaintiff was advised to monitor any vision changes and return with any decrease in vision. Plaintiff was given a referral for a neuro-ophthalmologist for further testing due to blurred vision for inconsistency in exam findings. She was encouraged to have yearly eye exams and physicals from her primary care physician. (Tr. 263). Plaintiff was also diagnosed with vitreous degeneration in her left eye. Dr. Chew noted that posterior vitreous detachment accounted for her complaints, but there was no evidence of retinal pathology. He discussed the signs and risks of retinal

detachment and tears and instructed her to return to the office immediately if she had any of those symptoms.  (Tr. 263).

On September 27, 2016, Plaintiff returned to McFarland Eye Center with complaints of trouble seeing at night in the right eye and the left eye and some pain in her eyes.  (Tr. 271). She stated her condition was worsening. (Tr. 271).  Plaintiff reported that she failed the screening for her driver's exam and that she could not get a driver's license.  Plaintiff also reported that she tried to work at Wendy's, but that she could not see the board or the cash register clearly enough.  (Tr. 271).  Dr. Paul J. Misischia, DO, noted that Plaintiff's mood and affect were normal, and she was oriented to person, place and time.  (Tr. 272).  He also determined that while Plaintiff had a combined form of bilateral, age-related cataracts, her condition was stable.  Dr. Misischia opined the following: that there was no treatment currently recommended; that when the cataracts started to interfere with daily activities, then they could be removed; that her VF was constricted and that new glasses would help improve her vision; and that she should be seen by Dr. Doyle for further evaluation.  He noted that Plaintiff did not need assistance around the office.  (Tr. 274).

On November 14, 2016, Plaintiff saw Dr. Melissa Doyle for a neuro-ophthalmic examination.  (Tr. 282).  Plaintiff did not have any of her medical records with her that day. Plaintiff reported that she had "never been able to see 20/20" and that she had not passed her vision test for her driver's license.  She reported that her vision had gotten worse recently. Plaintiff complained about her vision, particularly when driving at night, and pain with eye movement with migraines and eye discharge.  (Tr. 282). Dr. Doyle observed that Plaintiff did well maneuvering around the room and that she did not have terrible difficulty finding her way to checkout.  She had no signs of optic neuropathy to account for her visual field abnormalities.

6

(Tr. 282). Dr. Doyle opined that without the benefit of Plaintiff's other medical records, it appeared that she had peripheral visual field abnormalities. (Tr. 283). The differential diagnosis for bilateral peripheral visual field constriction was pseudotumor cerebri, glaucoma, retinitis pigmentosa, vitamin A deficiency, and conversion disorder. (Tr. 282). Dr. Doyle noted that if Plaintiff had not had a retina examination with electroretinogram, that it would be prudent to rule out retinitis pigmentosa. (Tr. 282).

On November 30, 2016, Dr. James Wellons, a non-examining medical consultant, completed a Physical RFC Assessment where he found that Plaintiff had visual limitations of limited near acuity on the left eye. (Tr. 72). Dr. Wellons concluded that Plaintiff was capable of light work and was limited to jobs that did not require excellent vision. (Tr. 73).

On January 16, 2017, Dr. Clarence Ballard, a non-examining medical consultant, completed a Physical RFC Assessment where he affirmed Dr. Wellons' assessment of light work and jobs that did not require excellent vision. (Tr. 90).

On January 17, 2017, Dr. Kay Cogbill, a non-examining medical consultant, completed a Psychiatric Review Technique and a Mental RFC Assessment wherein she affirmed Dr. Santulli's assessment. (Tr. 87, 92).

On March 31, 2017, Plaintiff was seen at the Quapaw House Recovery and Wellness Center for her second attempt at voluntary treatment. (Tr. 297). In a biopsychosocial assessment, Plaintiff reported that her primary substance abuse was currently methamphetamine, which she used intravenously, and that her last use was on March 26, 2017. Plaintiff stated that she first used methamphetamine at the age of 22 and began using regularly on a daily basis by the age of 25. She did not abuse other substances. (Tr. 297). Plaintiff

reported no physical medical issues and no medication of any kind. (Tr. 298-299). Plaintiff reported a family history of substance abuse and addiction, depression, and suicide. (Tr. 301). She stated that she did not have much of a childhood and did not have a relationship with her brothers or her father. (Tr. 301). She stated that she was on her fourth marriage and that her parental rights had been terminated as to her children. Plaintiff also reported the use of methamphetamine and marijuana recently. (Tr. 302). Plaintiff had previous diagnoses of ADHD, PTSD, anxiety, and attachment displacement disorder. (Tr. 304). Thirty days of residential treatment was recommended, and her prognosis was fair. (Tr. 304). Upon discharge on April 27, 2017, Plaintiff was not given any medication and further treatment included twelve step meetings and Quapaw House outpatient treatment. (Tr. 304-305). While inpatient, Plaintiff attended groups and participated in all group activities as well as completed all group assignments and handouts and processed her anxiety and PTSD. (Tr. 306). Assessment notes included that Plaintiff had "a good prognosis due to being in the action state of change." (Tr. 306).

On April 1, 2017, Plaintiff was seen at the Quapaw House Recovery and Wellness Center for substance use education, relapse prevention, after care plan and PTSD/anxiety. (Tr. 290). The plan was daily group therapy. (Tr. 291).

On June 13, 2017, Plaintiff was seen at Therapeutic Family Service for an Intake Assessment. (Tr. 309). Plaintiff reported that she was having nightmares; that her husband had just gone to prison; that she was having extreme anxiety; and that she was also having panic attacks. (Tr. 309). She also reported that she would "flip out for stupid reasons" at group therapy; that she was not sleeping well; that she had extreme highs and lows; that she missed her children terribly; that she stayed clean for "a long time" and she still did not get her children

8

back; that she was kidnapped and tortured by a boyfriend before coming to Arkansas; and that she had recently reconnected with her step-mother. (Tr. 309). Problems were noted with feelings of bereavement, focusing, flashbacks, feelings of depression, low energy, crying spells, mania, mood swings, fear, relationship deficits, substance abuse, symptoms of traumatic stress, self-injurious behavior, theft, and physical aggression. (Tr. 316-317). Her mental status examination showed anxious behavior, rapid speech when discussing traumatic events, restlessness, and a history of self-harm. (Tr. 318). Clinical prognosis was fair due to Plaintiff only recently having been clean for seventy-seven days and due to many intrusive memories that were starting to surface. (Tr. 318). Individual therapy and pharmacological management were recommended. (Tr. 319). She was diagnosed with posttraumatic stress disorder and schizoaffective disorder- bipolar type. (Tr. 319).

Plaintiff's June 26, 2017, urine drug screen was negative. (Tr. 330).

On July 5, 2017, Dr. Robert Farrell completed a Physician's Certification of Adult with a Serious Mental Illness form, wherein he noted that Plaintiff had serious role impairment in her main productive roles, for example, consistently missing at least one full day of work per month as direct result of her mental health; had serious interpersonal impairment as a result of being totally socially isolated, lacking intimacy in social relationships, showing inability to confide in others and lacking social support; and having difficulties that substantially interfered with or limited role functioning in basic daily living skills, such as eating, bathing, dressing. (Tr. 325). Dr. Farrell also completed an Initial Psychiatric Diagnostic Assessment where he noted Plaintiff's long history of PTSD trauma and drug use; that she was very anxious, depressed, and fearful; that she could not sleep; that she was having panic attacks during the day; and that she was requesting help with her disrupted sleep. (Tr. 327). He diagnosed her

9

with posttraumatic stress disorder and schizoaffective disorder with a guarded prognosis. He recommended she continue her current medication regimen without any changes. He noted that she had a good relationship with her therapist. Plaintiff did not have any suicidal or homicidal ideation and was safe for outpatient management. (Tr. 328).

On September 6, 2017, Dr. Farrell evaluated Plaintiff. (Tr. 331). He noted that her last drug screen was clean and that her anxiety was still high. (Tr. 331). Her appearance, speech and thought process were normal. Her insight was limited, and her motor behavior was restless. Her mood was anxious, but her orientation was full and her memory current. Her mood and affect were anxious. (Tr. 331). Dr. Farrell's notes indicated that Plaintiff's anxiety was a big issue for her and started her on Buspar. He noted there was no suicidal or homicidal ideation and that she was safe for outpatient management. (Tr. 332).

On September 12, 2017, Plaintiff was seen at Therapeutic Family Services for a Treatment Plan Review, during which it was noted that she continued to struggle in certain areas and that her medication dosage needed to be adjusted. Plaintiff reported that she wanted to get batter but that she struggled with hearing voices. (Tr. 323).

### III. Applicable Law:

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. Ramirez v. Barnhart, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance, but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that

supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); see also 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382(3)(C). A Plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given her age, education, and experience. See 20 C.F.R. § 416.920. Only if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work

experience in light of her RFC. See McCoy v. Schweiker, 683 F.2d 1138, 1141-42 (8th Cir. 1982), abrogated on other grounds by Higgins v. Apfel, 222 F.3d 504, 505 (8th Cir. 2000); 20 C.F.R. § 416.920.

**IV.   Discussion:**

Plaintiff makes the following arguments on appeal: 1) that the ALJ's RFC Assessment as to Plaintiff's physical functional limitations was unsupported by the evidence; 2) that the ALJ's RFC Assessment as to Plaintiff's mental impairments was unsupported by substantial evidence; and 3) that the Commissioner failed to carry her burden of proof at Step Five. (Doc. 11, pp. 8-16).

**A.   Subjective Complaints and Credibility Analysis:**

The ALJ was required to consider all the evidence relating to Plaintiff's subjective complaints including evidence presented by third parties that relates to: (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of her pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of her medication; and (5) functional restrictions. See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole. Id. As the Eighth Circuit has observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." Edwards, 314 F.3d at 966.

After reviewing the administrative record, it is clear that the ALJ properly considered and evaluated Plaintiff's subjective complaints, including the Polaski factors. In addressing Plaintiff's credibility, the ALJ noted Plaintiff's testimony that she was unable to work due to her panic attacks. (Tr. 51). She stated she had a fear of being alone, fear of crowds, anxiety,

irritability, and an inability to work for long periods of time. (Tr. 51). Plaintiff also testified that she had trouble with her vision being a little blurry, endorsing problems reading and seeing the cash register at a previous job she held. (Tr. 54). Plaintiff testified that she did not wear corrective lenses. (Tr. 59). In response to the ALJ's questions about her vision, Plaintiff testified that she could see the ALJ; she could see a chair in front of her; she could see if a door was opened or closed; and she could avoid running into things. (Tr. 60). Plaintiff also testified that she enjoyed hobbies, such as watching television. (Tr. 54).

In the June 2, 2016, Function Report, Plaintiff reported that she cared for her husband; that she fed, watered, and played with her pets; that she did laundry, swept, and mopped; and that she prepared simple meals. (Tr. 187). She reported that she had no problems with personal care; that she went out once or twice a week; that she shopped in stores for food; and that she managed her money. (Tr. 188-189). Plaintiff also reported, however, that she had trouble sleeping due to her fears; that she could not go out alone; that she did not socialize often; and that she had trouble getting along with others. (Tr. 189-192). In a January 1, 2017, Function Report, Plaintiff added that she had days where she did not get out of bed; that she had trouble getting along and had been laid off for issues with co-workers; and that she did not follow written instructions well. (Tr. 218-220).

With respect to Plaintiff's physical impairments, the record demonstrates that the issues with Plaintiff's vision were evaluated and that no treatment other than the possible use of corrective lenses was recommended. See Robinson v. Sullivan, 956 F.2d 836, 840 (8th Cir. 1992) (course of conservative treatment contradicted claims of disabling pain).

With respect to Plaintiff's mental impairments, the record demonstrates that Plaintiff was treated conservatively with medication and treatment. The record also demonstrates that

Plaintiff had not had any inpatient treatment as an adult; however, she had previously been on mental health medications. The record also showed that she received outpatient therapy in 2010 or 2011 as a part of her termination of parental rights case. At a mental evaluation with Dr. Linda Josef in June of 2016, notes indicated that Plaintiff was not in treatment at that time and that she was not on any mental health medication. (Tr. 254). In 2017, Plaintiff received voluntary, inpatient drug treatment from March 29, 2017 through April 27, 2017, for thirty days at Quapaw House, where she participated in all group activities and was discharged with a good prognosis. (Tr. 306). In June 2017, Plaintiff began some outpatient treatment at Therapeutic Family Services. There was no further evidence of ongoing counseling or specific psychiatric treatment for Plaintiff's mental conditions. See Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001) (holding that lack of evidence of ongoing counseling or psychiatric treatment for depression weighs against Plaintiff's claim of disability).

The medical record also showed that Plaintiff's medication was helpful at times and that her mental health conditions improved somewhat with treatment on occasion. Impairments that can be controlled with treatment or medication are not disabling. See Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002) (holding that an impairment controllable with treatment or medication is not considered disabling).

Lastly, the record consisted of two consultative evaluations in June of 2016, two visits to McFarland Eye Centers in July and September of 2016, a visit to the neuro-ophthalmic physician in November of 2016, records from a 30-day voluntary, inpatient stay at Quapaw House Recovery and Wellness Center, and records from Therapeutic Family Services on June 23, 2017, July 5, 2017, September 6, 2017, and September 12, 2017. Thus, Plaintiff did not receive any treatment from November of 2016, through March of 2017, and from September

12, 2017, through May 31, 2018, the end of the relevant time period. Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997) (the fact that a plaintiff fails to seek regular medical treatment disfavors a finding of disability).

Although it is clear that Plaintiff suffers some degree of limitation, she has not established that she is unable to engage in any gainful activity. Accordingly, the Court concludes that substantial evidence supports the ALJ's conclusion that Plaintiff's subjective complaints were not totally credible.

### B. ALJ's RFC Determination:

RFC is the most a person can do despite that person's limitations. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). It is assessed using all relevant evidence in the record. Id. This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of her limitations. Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace. Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003). "[T]he ALJ is [also] required to set forth specifically a claimant's limitations and to determine how those limitations affect h[er] RFC." Id.

In finding Plaintiff able to perform light work with limitations, the ALJ considered Plaintiff's subjective complaints, the medical records, the records from treating physicians, and

the evaluations of the examining and non-examining agency medical consultants. The Court notes that in determining Plaintiff's RFC, the ALJ discussed the medical opinions of treating and non-examining medical professionals, and set forth the reasons for the weight given to the opinions. Renstrom v. Astrue, 680 F.3d 1057, 1065 (8th Cir. 2012) ("It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians")(citations omitted); Prosch v. Apfel, 201 F.3d 1010 at 1012 (the ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole).

Plaintiff argues that there was an inconsistency between the ALJ's RFC determination and the opinion of Dr. Wellons, a non-examining medical consultant, when the ALJ gave great weight to Dr. Wellons' opinion, but did not include any limitation in the RFC regarding Plaintiff's limited near acuity. However, the ALJ did, in fact, limit Plaintiff in the RFC by the condition that she was able to see to avoid hazards in the work area. (Tr. 33). Moreover, the evidence showed that Dr. Chew examined Plaintiff and diagnosed her with a combined form of age-related cataracts, bilaterally, but he did not recommend any treatment. (Tr. 263). He advised Plaintiff to monitor any vision changes and return with any decrease in vision. Plaintiff was given a referral for a neuro-ophthalmologist for further testing due to an inconsistency in exam findings. (Tr. 263). Dr. Misischia also opined that Plaintiff had a combined form of age-related cataracts, bilaterally, but that her condition was stable. (Tr. 274). Dr. Misischia also found the following: that no treatment was currently recommended; that when the cataracts started to interfere with daily activities, then they could be removed; that her VF was constricted and that new glasses would help improve her vision; and that she should be seen by Dr. Doyle for further evaluation. (Tr. 274). Dr. Melissa Doyle, who performed the most

16

recent examination of Plaintiff's eyes, found that Plaintiff had no signs of optic neuropathy to account for her visual field abnormalities and that she had intact optic nerve function based on evoked potential. She also noted that it appeared that Plaintiff had some peripheral visual field abnormalities of unknown etiology. (Tr. 282-283). Finally, Dr. Misischia, as well as Dr. Melissa Doyle, both noted that while in their offices, Plaintiff did not have any trouble maneuvering around the room or difficulty finding her way to check-out. (Tr. 274-282).

Plaintiff also reported that she had no problems with personal care and doing chores around the house, including laundry, sweeping, and mopping. (Tr. 187). She stated that one of her hobbies was watching television with her husband. She also reported that she cared for her husband; that she fed, watered, and played with her pets; and that she prepared simple meals. (Tr. 187). She reported that she went out once or twice a week; that she shopped in stores for food; and that she could manage her finances. (Tr. 188-189).

While in a January 2017 Function Report, Plaintiff stated that she had trouble standing more than thirty minutes as a result of pain in her feet and legs, Plaintiff did not allege any physical impairments in her application, nor did the medical records show any complaints or treatment for physical conditions other than her vision. In June of 2016, Dr. Daniel Irons performed a General Physical Examination on Plaintiff, where he found that based on his examination, Plaintiff did not have any physical limitations. (Tr. 251). The ALJ, however, found that based on the medical record, Plaintiff was more limited than Dr. Irons opined, which was reflected in the RFC determination.

The Court also notes that the ALJ also took Plaintiff's obesity into account when determining that Plaintiff could perform light work with limitations. Heino v. Astrue, 578 F.3d

17

873, 881-882 (8th Cir. 2009) (when an ALJ references the claimant's obesity during the claim evaluation process, such review may be sufficient to avoid reversal).

With regard to Plaintiff's mental impairments, Plaintiff also makes the same argument with regard to the ALJ's RFC determination, alleging that while the ALJ gave great weight to Dr. Santulli's opinion, she did not include in the RFC all of the limitations set forth by Dr. Santulli. In determining the RFC, the ALJ also considered and gave great weight to Dr. Lina Josef's opinion following a mental diagnostic evaluation of Plaintiff in June of 2016. Dr. Josef diagnosed Plaintiff with posttraumatic stress disorder, borderline traits, and polysubstance use disorder. (Tr. 258). Dr. Josef noted that Plaintiff participated in normal activities of daily living; that she appeared to be capable of adequate and socially appropriate communication and interaction despite some mild irritability and agitation; that Plaintiff did not have any difficulty that day of communicating in an understandable and effective manner; that Plaintiff exhibited the capacity to cope with the typical mental/cognitive demands of basic work-like tasks; that she exhibited the ability to attend and sustain concentration on basic tasks; and that she displayed low persistence, but had the capacity to perform within a basically acceptable timeframe. (Tr. 259). Dr. Josef also noted Plaintiff's report of legal issues as well as her alcohol and drug use. (Tr. 255). Dr. Josef noted that Plaintiff was late for the interview; had an anxious, irritable, and fidgety manner; became distraught; and exhibited restless and agitated behavior. (Tr. 256). However, Plaintiff was alert and oriented. (Tr. 257). Dr. Josef noted that Plaintiff minimized her substance abuse; however, the pattern she described was strongly suggestive of work and social problems related to substance abuse. Dr. Josef noted that it was possible that after living with her in-laws that her capabilities would substantially improve as she progressed into full remission. (Tr. 258).

The ALJ also considered and gave great weight to Dr. Santulli's opinion that Plaintiff was capable of performing unskilled work. The ALJ also considered the treating physicians' records, which included a thirty-day, voluntary inpatient period at Quapaw House for abuse of methamphetamine, where assessment notes stated that Plaintiff reported having last used methamphetamine five days prior, but that she had "a good prognosis due to being in the action state of change." (Tr. 306). Plaintiff was discharged from treatment with no medication and a recommendation of continuing outpatient treatment at Quapaw House. (Tr. 304-305). Medical records did not show that Plaintiff returned to Quapaw House for continuation of her treatment as recommended, but in June of 2017, she was seen at Therapeutic Family Services where she reported panic attacks and anxiety and the fact that her husband had recently gone to prison. (Tr. 309). At Therapeutic Family Services, Plaintiff was diagnosed with posttraumatic stress disorder and schizoaffective disorder for which individual therapy and pharmacological management were recommended for her conditions. (Tr. 319). In July of 2017, and September 2017, when Plaintiff returned to Therapeutic Family Services for treatment, she was still struggling with symptoms; however, her mental status examination showed she had normal grooming and cleanliness, was fully oriented, had a cooperative attitude, had a logical thought process, and had an intact memory, concentration and attention. In July, her medications were unchanged, but in September, Dr. Farrell added Buspar. (Tr. 328, 332).

Upon careful review of the record, the Court finds that Plaintiff's arguments are without merit and that substantial evidence supports the ALJ's RFC determination.

### C. Hypothetical Question to the Vocational Expert:

After thoroughly reviewing the hearing transcript along with the entire evidence of record, the Court finds that the hypothetical the ALJ posed to the vocational expert fully set forth the impairments which the ALJ accepted as true and which were supported by the record as a whole. Goff v. Barnhart, 421 F.3d 785, 794 (8th Cir. 2005). Accordingly, the Court finds that the vocational expert's opinion constitutes substantial evidence supporting the ALJ's conclusion that Plaintiff's impairments did not preclude her from performing work as a cleaner/housekeeper and a price marker during the time period in question. Pickney v. Chater, 96 F.3d 294, 296 (8th Cir. 1996) (testimony from vocational expert based on properly phrased hypothetical question constitutes substantial evidence).

### V. Conclusion:

Based on the foregoing, the Court recommends affirming the ALJ's decision, and dismissing Plaintiff's case with prejudice. **The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 7th day of October, 2019.

/s/ *Erin L. Wiedemann*
HON. ERIN L. WIEDEMANN
UNITED STATES MAGISTRATE JUDGE